1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL BROWN,                                )<br>                                                              )<br>          Plaintiff,                              )<br>                                                              )<br>     vs.                                             )<br>                                                              )<br>CITY OF LOS ANGELES; DAVID          )<br>AUBREY; JAMES WARD; JON KIRK     )<br>MUKRI and DOES 1 through 50,           )<br>                                                              )<br>          Defendants.                          )<br>                                                              ) | CASE NO. CV 13-06455 MMM (JEMx)<br><br>ORDER RE: DEFENDANTS' MOTIONS<br>*IN LIMINE* |

On June 28, 2013, Michael Brown filed this action in Los Angeles Superior Court against the City of Los Angeles Department of Recreation and Parks, David Aubrey, James Ward, and Jon Kirk Mukri (collectively "defendants"), alleging discrimination in violation of the Unruh Civil Rights Act and 42 U.S.C. § 1983.[1]  Defendants removed the action to this court on September 4, 2013.[2]  On November 26, 2013, Brown filed a first amended complaint that added Penny Siebrandt as a defendant.[3]  The court granted in part and denied in part defendants' motion for

---

[1]Notice of Removal ("Removal"), Docket No. 1 (Sept. 4, 2013), Exh. A ("Complaint").

[2]Removal at 1.

[3]First Amended Complaint ("FAC"), Docket No. 19 (Nov. 26, 2013), ¶ 5.

summary judgment on October 9, 2014.[4]  Subsequently, defendants jointly filed thirteen motions *in limine* seeking to preclude evidence or argument concerning: (1) the use of the "N-word ";[5] (2) Brown's popularity or qualifications;[6] (3) the incident between Brown and Tim Cotti;[7] (4) John Ricks' return of Brown's PGA registration form;[8] (5) the reasons David Aubrey was transferred to a different golf course;[9] (6) Brown's Live Scan documentation;[10] (7) Bob Davis;[11] (8) Penny

---

[4]Order Granting in Part and Denying in Part Defendants' Motion for Summary Judgment ("Order"), Docket No. 81 (Oct. 9, 2014).  The court granted summary judgment in favor of all defendants on Brown's Unruh Civil Rights Act claims to the extent they were based on Ward's decision to allow golf professionals Bobby Hinds and Brady Riggs to pay a monthly rental rate while denying Brown's request for a monthly rate, and on Ward's decision to suspend Brown for purported non-payment of rental fees.  It denied summary judgment to the extent the Unruh Act claims were based on Aubrey's practice of approaching Brown during lessons to request payment. (*Id.* at 56.)  The court also granted summary judgment in favor of all defendants on Brown's Ralph Civil Rights Act claim, and in favor of the City of Los Angeles on Brown's § 1983 Equal Protection claim.  (*Id.*)  It denied the remaining defendants' motion for summary judgment on Brown's § 1983 claim.  (*Id.*)

[5]Notice of Motion and Motion *in Limine* (#1) to Exclude Evidence and/or Use of the [N-word] ("N-word MIL"), Docket No. 43 (Sept. 29, 2014).

[6]Notice of Motion and Motion *in Limine* (#2) to Exclude Evidence of Plaintiff's Popularity or Qualifications ("Popularity MIL"), Docket No. 44 (Sept. 29, 2014).

[7]Notice of Motion and Motion *in Limine* (#3) to Exclude Evidence of Incident Between Plaintiff and Tim Cotti ("Cotti MIL"), Docket No. 45 (Sept. 29, 2014).

[8]Notice of Motion and Motion *in Limine* (#4) to Exclude Evidence Regarding Plaintiff's PGA Registration Form Being Returned by John Ricks ("PGA MIL"), Docket No. 46 (Sept. 29, 2014).

[9]Notice of Motion and Motion *in Limine* (#5) to Exclude Evidence Regarding Why David Aubrey was Transferred to Another Golf Course ("Aubrey Transfer MIL"), Docket No. 47 (Sept. 29, 2014).

[10]Notice of Motion and Motion *in Limine* (#6) to Exclude Evidence of Discussions Relating to Plaintiff's Live Scan Documentation ("Live Scan MIL"), Docket No. 48 (Sept. 29, 2014).

[11]Notice of Motion and Motion *in Limine* (#7) to Exclude References to Bob Davis ("Davis MIL"), Docket No. 49 (Sept. 29, 2014).

Siebrandt's search for an Asian golf instructor for a different golf course;[12] (9) David Aubrey's employment issues;[13] (10) topics or issues the court deems irrelevant or lacking merit;[14] (11) Bobby Hinds' and Brady Riggs' "secret" deal;[15] (12) the type of music David Aubrey prefers to and the jokes he has heard;[16] and (13) the types of alcoholic drinks consumed by Brown and various witnesses.[17]   Brown opposes each motion except the thirteenth.[18]

---

[12]Notice of Motion and Motion *in Limine* (#8) to Exclude Evidence Concerning Penny Siebrandt Seeking an Asian Golf Instructor for a Different Golf Course ("Siebrandt MIL"), Docket No. 50 (Sept. 29, 2014).

[13]Notice of Motion and Motion *in Limine* (#9) to Exclude David Aubrey's Employment Personnel Issues ("Aubrey Employment MIL"), Docket No. 51 (Sept. 29, 2014).

[14]Notice of Motion and Motion *in Limine* (#10) to Exclude Evidence that this Court Deems Irrelevant and Lacking Sufficient Merit via Order on Defendants' Motion for Summary Judgment ("MSJ Order MIL"), Docket No. 52 (Sept. 29, 2014).

[15]Notice of Motion and Motion *in Limine* (#11) to Exclude Testimony that Two Golf Professionals Had a "Secret" Deal ("Secret Deal MIL"), Docket No. 53 (Sept. 29, 2014).

[16]Notice of Motion and Motion *in Limine* (#12) to Exclude Evidence of Music and Jokes to Which David Aubrey Listens or Has Heard ("Aubrey Music MIL"), Docket No. 54 (Sept. 29, 2014).

[17]Notice of Motion and Motion *in Limine* (#13) to Exclude the Types of Alcoholic Drinks Consumed by Plaintiff and Witnesses ("Drinks MIL"), Docket No. 55 (Sept. 29, 2014).

[18]Opposition re: Motion *in Limine* (#1) to Exclude Evidence and/or Use of the N-word ("N-word Opp."), Docket No. 64 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#2) to Exclude Evidence of Plaintiff's Popularity or Qualifications ("Popularity Opp."), Docket No. 65 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#3) to Exclude Evidence of Incident Between Plaintiff and Tim Cotti ("Cotti Opp."), Docket No. 66 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#4) to Exclude Evidence Regarding Plaintiff's PGA Registration Form Being Returned By John Ricks ("PGA Opp."), Docket No. 67 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#5) to Exclude Evidence Regarding Why David Aubrey was Transferred to Another Golf Course ("Aubrey Transfer Opp."), Docket No. 68 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#6) to Exclude Evidence of Discussions Relating to Plaintiff's Live Scan Documentation ("Live Scan Opp."), Docket No. 69 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#7) to Exclude References to Bob Davis ("Davis Opp."), Docket No. 70 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#8) to Exclude Evidence Concerning Penny Siebrandt Seeking an Asian Golf Instructor for a Different Golf Course ("Seibrandt Opp."), Docket No. 71 (Oct. 8, 2014); Opposition re:

# I.  FACTUAL BACKGROUND[19]

## A.    Woodley Lakes Golf Course and the City Takeover

From 1998 to October 31, 2011, the golf professional shop, golf course, and driving range at Woodley Lakes Golf Course ("Woodley Lakes") were privately operated by Golf LA Partners.[20]  During this period, Tim Cotti was the head golf professional and also ran Woodley Lakes' professional shop.[21]  Plaintiff Michael Brown, Quady Sanchez, Brady Riggs, and Bobby Hinds were golf instructors who paid either a monthly, hourly, per lesson, or percentage fee to Golf LA Partners to rent a driving range stall used to give lessons to their clients.[22]  Brown paid a monthly fee.[23]  On October 31, 2011, the City of Los Angeles Department of Recreation and

---

Motion *in Limine* (#9) to Exclude David Aubrey's Employment Personnel Issues ("Aubrey Employment Opp."), Docket No. 72 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#10) to Exclude Evidence that this Court Deems Irrelevant and Lacking Sufficient Merit via Order on Defendants' Motion for Summary Judgment ("MSJ Order Opp."), Docket No. 73 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#11) to Exclude Testimony that Two Golf Professionals Had a "Secret" Deal ("Secret Deal Opp."), Docket No. 74 (Oct. 8, 2014); Opposition re: Motion *in Limine* (#12) to Exclude Evidence of Music and Jokes to Which David Aubrey Listens or Has Heard ("Aubrey Music Opp."), Docket No. 75 (Oct. 8, 2014).  On October 14, 2014, defendants asked that the court strike Brown's opposition briefs under Local Rule 7-12 because they were filed on October 8, 2014, two days after the deadline set forth in the local rules.  (Defendants' Joint Request to Strike Plaintiff's Late Filed Oppositions to Defendants' Joint Motion *in Limine* Nos. 1 through 12, Docket No. 101 (Oct. 14, 2014).)  The court denied defendants' request on October 15, 2014.  (Minute Order In Chambers: Denying Request to Strike Oppositions to Motions *in Limine*, Docket No. 102 (Oct. 15, 2014).)

[19]The factual background is taken from the court's order granting in part and denying in part defendants' motion for summary judgment.

[20]Statement of Uncontroverted Facts ("SUF"), Docket No. 27-1 (May 19, 2014), ¶ 1; Statement of Genuine Issues ("SGI"), Docket No. 33-1 (June 9, 2014), ¶ 1.

[21]SUF, ¶ 2; SGI, ¶ 2.

[22]SUF, ¶ 3; SGI, ¶ 3.

[23]SUF, ¶ 4; SGI, ¶ 4.

Parks (the "City") took over the management and operation of Woodley Lakes.[24]  At the time the City assumed control, defendant John Kirk Mukri was the General Manager of the Department of Recreation and Parks.  Mukri was not personally involved in the operation of Woodley Lakes.[25] Defendant James Ward, the City's Golf Manager, became the lead supervisor at Woodley Lakes. Defendant Penny Siebrandt was a Golf Start Supervisor II, while defendant David Aubrey was a Golf Start Supervisor I.[26]  In her capacity as a Golf Start Supervisor II, Seibrandt was Aubrey's direct supervisor.

In November 2011, after the City assumed control of Woodley Lakes, Cotti, allegedly used a racial epithet in addressing Brown.[27]  At the time of the incident, Cotti's only affiliation with the City and the golf course was as a self-employed, registered teaching professional.[28]  No City employee directed a racial epithet at Brown or used one in his presence.[29]  Following the incident, Aubrey and the police both completed incident reports that were submitted to Seibrandt; after reviewing the reports, Seibrandt conducted no further investigation.[30]

**B.     The City's "Temporary Agreement" With Woodley Lakes Golf Professionals**

When the City took over the operation of Woodley Lakes, it imposed certain requirements on golf professionals who wished to teach at the driving range,[31] and Ward began to prepare a

---

[24]SUF, ¶ 5; SGI, ¶ 5.

[25]SUF, ¶ 6.

[26]SUF, ¶ 7.

[27]SUF, ¶ 10.

[28]SUF, ¶ 8.

[29]SUF, ¶ 9.

[30]Plaintiff's Corrected Separate Statement of Facts ("SSF"), Docket No. 34-2 (June 16, 2014), ¶ 67.

[31]SUF, ¶ 11; SGI, ¶ 11.

report to be submitted to the Board of Recreation and Parks Commissioners for approval.[32]   On November 1, 2011, the City sent a letter to Woodley Lakes golf instructors that outlined a "temporary agreement" about their continuing services.   The agreement provided, among other things, that "teaching professionals" were required to submit a volunteer application, be fingerprinted by Live Scan, pay $20 an hour to rent a driving range stall for golf lessons, and rent a stall before any lesson began.[33]   It also stated that teaching professionals would be subject to the City's rules and regulations, and that permission to use the facility could be revoked if the rules and regulations were not followed.[34]   The agreement and offer to continue was sent to all instructors at Woodley Lakes; no distinctions were made based on qualifications or affiliation with the PGA.[35]

A few weeks after the City took over Woodley Lakes, teaching professionals Riggs and Hinds told Brown, on two occasions, that they wanted to negotiate a monthly rate with the City because they were dissatisfied with the hourly rate structure set forth in the "temporary agreement."[36]   In November or December 2011, Riggs approached Ward to inquire about paying a monthly, rather than hourly, rate at Woodley Lakes.[37]   Riggs also raised the subject of a monthly rate, sending Ward two emails in January 2012.[38]   In February 2012, Riggs and Hinds again asked Ward if they could pay a monthly rather than an hourly rate.[39]   During the course of his

---

[32]SUF, ¶ 12.

[33]SUF, ¶ 13.

[34]SSF, ¶ 71.

[35]SSF, ¶¶ 16, 72.

[36]SUF, ¶ 14; SGI ¶ 14.

[37]SGI, ¶ 15.

[38]SGI, ¶ 15; SSF, ¶ 183.

[39]SUF, ¶ 15.

6

communications with Ward, Hinds' PGA certification was never discussed.[40]  Ward thereafter granted Riggs' and Hinds' request for a monthly rate.[41]  This change was not submitted to the Board of Recreation and Parks Commissioners for approval, but was a decision made by Ward and his management team.[42]  Ward said he made the decision because Riggs and Hinds asked for a monthly rate, were PGA-certified Class A professionals, complied with the City's insurance requirement, and regularly paid when payment was requested by the City.  He also said he was preparing a report to the commissioners that contemplated requiring all registered teaching professionals at City facilities to be PGA-certified Class A.[43]  The City did not advise any of the teaching professionals at Woodley Lakes in writing that if they obtained PGA certification, they would be entitled to a monthly rental rate.[44]

Brown eventually learned that Ward had approved a monthly rate for Riggs and Hinds.[45] At no time – either prior to or after learning of the decision – did Brown personally ask Ward if he could pay a monthly fee instead of the hourly fee charged by the City.[46]  His attorneys, however, met with Ward on February 5, 2012, and asked that Brown be given a monthly rate. Ward did not agree, and did not tell Brown's attorneys he was considering similar requests by

[40]SSF, ¶ 170.

[41]SUF, ¶ 16, SGI, ¶ 16.

[42]SSF, ¶¶ 175, 182, 237.

[43]SUF, ¶ 16.

[44]SSF, ¶ 228.

[45]SUF, ¶ 18; SGI, ¶ 18.

[46]SUF, ¶ 19.

1   Hinds and Riggs.[47]   At the time, Brown was not PGA-certified.[48]   Brown and the remaining golf

2   instructors continued to be charged $20 per hour to rent driving range stalls at Woodley Lakes.[49]

3   ### C.   Brown's Suspension from Woodley Lakes

4   As a Golf Start Supervisor I, Aubrey was responsible for collecting fees from the registered

5   teaching professionals and keeping track of the number of lessons each taught and the fees each

6   paid.[50]   The temporary agreement the City sent the professionals required that they pay for the

7   driving range stall before they gave a lesson.   Ward testified, however, that the professionals were

8   subject to an "honor system," and that this rule was not always enforced.[51]   On November 8,

9   2011, Siebrandt told Aubrey to gather logs on the failure of Brown, Cotti, and another

10   professional to pay rental fees for the driving range stalls.[52]   Towards the end of 2011, based on

11   subordinates' monitoring of professionals at the driving range, Ward believed that Brown had

12   failed to pay stall rental fees for lessons he gave.[53]   The City also believed Brown had not

13   completed the Live Scan requirement when he first applied to continue giving lessons at Woodley

14   Lakes because the documentation was misplaced by an elderly staff member.[54]   In late November

15   or early December, however, Brown approached Aubrey about the purportedly missing

16   documentation; upon conducting a search, Aubrey discovered the form in a pile of papers in the

17   office.[55]   On December 15, 2011, the City suspended Brown's privileges at Woodley Lakes

18   _____

19   [47]SGI, ¶ 19.

20   [48]SUF, ¶ 20.

21   [49]SUF, ¶ 21; SGI ¶ 21.

22   [50]SUF, ¶ 22.

23   [51]SSF, ¶ 88.

24   [52]SSF, ¶ 111.

25   [53]SUF, ¶ 26.

26   [54]SUF, ¶ 27.

27   [55]SGI, ¶ 27; SSF, ¶ 79.

28

because he had not complied "with any of the agreed on payments and/or teaching requirements," and "refuse[d] to settle [his] debts" at the course.[56]  No other teaching professional received a letter from the City regarding his alleged failure to pay rental fees.[57]

### D.    Brown's Reinstatement and the Board's Approval of Ward's Report

On December 23, 2011, after Brown agreed to follow the City's payment rules, his teaching privileges at Woodley Lakes were reinstated.[58]  Brown was given a course inspection card, which enabled him to inspect the golf course, in January 2012, at approximately the same time as other teaching professionals received one.[59]

In January 2013, the Board of Recreation and Parks Commissioners adopted Ward's proposed report.[60]  The report, among other things, required that all new teaching professionals be PGA-certified (existing professionals, like Brown, were exempt) and set forth new rental rates for driving range stalls that included hourly and monthly alternatives.[61]  It provided that, if a teaching professional chose the hourly rate, he had to pay the fee at the starter's window before beginning his lesson.[62]  In approximately April 2013, Brown opted to pay the monthly rate set forth in the report approved by the Commission.[63]

---

[56]SUF, ¶ 28; Brown Depo., Exh. 46.

[57]SSF, ¶ 112.

[58]SUF, ¶ 30.

[59]SUF, ¶ 37.

[60]SUF, ¶ 31; SGI, ¶ 31.

[61]SUF, ¶ 32; SGI, ¶ 32.

[62]SUF, ¶ 33.

[63]SUF, ¶ 34; SGI, ¶ 34.

### E.     Brown's Lawsuit

On June 28, 2013, Brown filed this action against the City, Ward, Siebrandt, Aubrey, and Mukri in Los Angeles Superior Court.[64]  The first amended complaint alleges claims for violation of the Unruh Civil Rights Act and 42 U.S.C. § 1983.[65]  Brown, who is African American, alleges that due to his race: (1) he was charged a different rate for renting space at Woodley Lakes than other teaching professionals – specifically, Riggs, who is Caucasian,[66] and Hinds, who is Latino, but is often mistaken for being Caucasian;[67] (2) he was not permitted to inspect the course like other teaching professionals; (3) unlike other teaching professionals, he was approached while giving lessons to his students and asked to pay stall rental fees; (4) the City misfiled his application to continue providing services at Woodley Lakes, and asserted that he had not complied with the Live Scan requirement; (5) the City condoned Cotti's use of a racial epithet; (6) Aubrey falsified his investigation of the incident with Cotti and failed to discipline Cotti; (7) Brown's teaching privileges were suspended on the pretext that he had not paid stall rental fees; and (8) Ward did not tell his attorneys that Hinds and Riggs had requested a monthly rental rate when they met with him on February 5, 2012.[68]

## II.  DISCUSSION

### A.     Legal Standard Governing Motions *in Limine*

Motions *in limine* are motions, "whether made before or during trial, to exclude anticipated prejudicial evidence before the evidence is actually offered." *Luce v. United States*, 469 U.S. 38, 40 n. 2 (1984); see *Goodman v. Las Vegas Metropolitan Police Dep't*, 963 F.Supp.2d 1036, 1046-

---

[64]SUF, ¶ 35; SGI, ¶ 35.  See also Removal, Docket No. 1 (Sep. 4, 2013).

[65]SUF, ¶ 36; SGI, ¶ 36.  See also FAC, Docket No. 19 (Nov. 26, 2013).

[66]SSF, ¶ 41.

[67]SSF, ¶ 44.

[68]SUF, ¶ 37; SGI, ¶ 37.  These allegations extend beyond those contained in Brown's first amended complaint.

47 (D. Nev. 2013) ("A motion *in limine* is a procedural device to obtain an early and preliminary ruling on the admissibility of evidence.  Black's Law Dictionary defines it as '[a] pretrial request that certain inadmissible evidence not be referred to or offered at trial.  Typically, a party makes this motion when it believes that mere mention of the evidence during trial would be highly prejudicial and could not be remedied by an instruction to disregard,'" citing BLACK'S LAW DICTIONARY at 1109 (9th ed. 2009)).  Motions *in limine* are an extension of the court's authority to manage trials under Rule 103(c) of the Federal Rules of Evidence.  *Luce*, 469 U.S. at 41 n. 4; see also *Carofino v. Forester*, 450 F.Supp.2d 257, 270 (S.D.N.Y. 2006) ("[T]he purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial,'" quoting *Palmieri v. Defaria*, 88 F.3d 136, 141 (2d Cir. 1996)).

Evidence may be excluded *in limine* only if "the evidence [is] inadmissible on all potential grounds."  *Goodman*, 963 F.Supp.2d at 1047 (citing *Indiana Ins. Co. v. General Electric Co.*, 326 F.Supp.2d 844, 846 (N.D. Ohio 2004)).  If it is not clear that evidence is inadmissible on all grounds, or if the motion requires the court to "resolve factual disputes or weigh evidence," the motion typically should be denied, with evidentiary rulings deferred until trial "so that questions of foundation, relevancy and potential prejudice may be resolved in proper context."  *C & E Services, Inc. v. Ashland, Inc.*, 539 F.Supp.2d 316, 323 (D.D.C. 2008) ("It is worth noting that a motion *in limine* should not be used to resolve factual disputes or weigh evidence," citing *Sigma Tool & Mach. v. Nagayama Elect. Ind. Co., Ltd.*, No. 00-CV-2936 (RWR), 2002 WL 34354482, *2 (D.D.C. Dec. 18, 2002)); *Hawthorne Partners v. AT & T Technologies, Inc.*, 831 F.Supp. 1398, 1400-01 (N.D. Ill. 1993) ("Unless evidence meets this high standard, evidentiary rulings should be deferred until trial so that questions of foundation, relevancy, and potential prejudice may be resolved in proper context," citing *Middleby Corp. v. Hussmann Corp.*, No. 90-C-2744, 1993 WL 151290, *1 (N.D. Ill. May 7, 1993)).

**B.**     **Whether the Court Will Consider Defendants' Motions *in Limine***

Brown contends the court should deny defendants' first twelve motions *in limine* because defendants do not submit authenticated, admissible evidence they seek to exclude in support of the motions.[69]  He asserts that defendants cannot base their motions on "pure argument" about broad categories of evidence and testimony they anticipate will be offered at trial.[70]  Rather, relying on *Orr v. Bank of America*, 285 F.3d 764 (9th Cir. 2002), Brown contends that defendants' motions must be supported by properly authenticated evidence before the court can reach the merits of their arguments.[71]

*Orr* is distinguishable.  In *Orr*, the Ninth Circuit held that "a trial court can only consider admissible evidence in ruling on a motion for summary judgment"; as a result, it stated, "unauthenticated documents cannot be considered."  *Orr*, 285 F.3d at 773 (citing FED.R.CIV.PROC. 56(e); *Cristobal v. Siegel*, 26 F.3d 1488, 1181 (9th Cir. 1994); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1550-51 (9th Cir. 1989); *Beyene v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1181-82 (9th Cir. 1988); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976)).  The court  focused solely on the sufficiency of evidence required to support or defeat motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.   The *Orr* court made no reference to motions *in limine*, or to the purported requirement that a party submit "authenticated, admissible evidence" in connection with such a motion, and Brown cites no authority supporting his expansive reading of *Orr*.  Indeed, since the purpose of a motion *in limine* is to exclude *inadmissible evidence*, it is unclear why the movant

---

[69]N-word Opp. at 2; Popularity Opp. at 2; Cotti Opp. at 2; PGA Opp. at 2; Aubrey Transfer  Opp. at 2; Live Scan Opp. at 2; Davis Opp. at 2; Siebrandt Opp. at 2; Aubrey Employment Opp. at 2; MSJ Order Opp. at 2; Secret Deal Opp. at 2; Aubrey Music Opp. at 2.

[70]*Id.*

[71]*Id.*

would first be required to establish the authenticity and/or admissibility of the evidence he seeks to exclude.

Moreover, the court is unpersuaded that defendants' failure to identify the exact evidence, i.e., deposition testimony or documentary evidence, that they seek to exclude merits denial of the motions.  While defendants do not cite all of the purportedly inadmissible evidence, they describe the character of the evidence in sufficient detail to place Brown on notice of what they assert should be excluded.  Courts regularly consider motions *in limine* of this kind, cf. *Oyarzo v. Tuolumne Fire District*, No. 1:11-CV-01271-SAB, 2013 WL 5718882, *9 (E.D. Cal. Oct. 18, 2013) (considering the merits of plaintiffs' motion *in limine* despite the fact that "Plaintiffs have not identified any evidence to be excluded and merely are requesting an order that defense counsel not engage in misconduct"), and the court elects to do so here.  Accordingly, the court will not deny the first twelve motions *in limine* because defendants did not attach the specific evidence they wish to exclude to their moving papers.

### C.   Defendants' Motion *in Limine* to Exclude Evidence and/or Use of the N-word

Defendants' first motion seeks to exclude any evidence or use of the N-word at trial.[72] Defendants argue that such evidence is irrelevant and highly prejudicial because it is undisputed that no City employee or defendant used the epithet at Woodley Lakes or in Brown's presence.[73] Brown counters that the motion must be denied because evidence of Tim Cotti's use of the N-word in an incident with Brown and David Aubrey's use of the word in jokes and when singing along with hip-hop songs is highly relevant in determining whether defendants discriminated against Brown on the basis of his race.[74]

Defendants clarify the scope of their motion in their reply, noting: "Defendants are not seeking to exclude any facts that this Court deems admissible at trial, but simply to exclude the

---

[72]N-word MIL at 2.

[73]*Id.* at 3-4.

[74]N-word Opp. at 2-5.

use of the word 'nigger' during trial."[75]  Because defendants' motion seeks only to preclude use
of the N-word at trial, the court addresses only that issue.  Defendants' arguments concerning
evidence of the incident between Brown and Tim Cotti and David Aubrey's songs and jokes are
better addressed *infra* in the context of separate motions addressing those categories of evidence.[76]

Rule 402 of the Federal Rules of Evidence requires that all evidence introduced at trial be
relevant.  FED.R.EVID. 402 ("Relevant evidence is admissible . . . .  Irrelevant evidence is not
admissible").  Evidence is relevant if "it has any tendency to make a fact more or less probable
than it would be without the evidence," and "the fact is of consequence in determining the action."
FED.R.EVID. 401.  Even if evidence is relevant, Rule 403 provides that a court may exclude it "if
its probative value is substantially outweighed by a danger of one or more of the following: unfair
prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly
presenting cumulative evidence."  Undue prejudice means an "undue tendency to suggest decision
on an improper basis, commonly, though not necessarily, an emotional one."  FED.R.EVID. 403,
Advisory Committee Notes, 1972 Proposed Rules.  See also *United States v. Old Chief*, 519 U.S.
172, 180 (1997).

Defendants contend that use of the epithet should be prohibited under Rule 403 because it
is inflammatory and likely to lead both to an emotional response by the jury and confusion of the
issues at trial.[77]  They argue that, to the extent use of the word is relevant, the parties should use
"the term 'racial epithet,' 'racial slur,' or even 'N-word'" instead.[78]  Brown counters that "on the
merits, use of the term, '[n]igger,' in a racial discrimination case is not out-of-place."[79]  The court
disagrees.

---

[75]Reply to Opposition to Motion *in Limine* (#1) to Exclude Evidence and/ or Use of the [N-word] ("N-word Reply"), Docket No. 83 (Oct. 10, 2014) at 2.

[76]See Cotti MIL; Aubrey Music MIL.

[77]N-Word MIL at 3-5.

[78]N-word Reply at 2.

[79]N-word Opp. at 5.

The N-word is "perhaps the most offensive and inflammatory racial slur in English, . . . a word expressive of racial hatred and bigotry." *Swinton v. Potomac Corp.*, 270 F.3d 794, 817 (9th Cir. 2001) (citing MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 784 (10th ed. 1993)); see *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) ("It is beyond question that the use of the word 'nigger' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination"); *NLRB v. Foundry Div. of Alcon Indus., Inc.*, 260 F.3d 631, 635 n. 5 (6th Cir. 2001) ("that the word 'nigger' is a slur is not debatable"); *Daso v. Grafton School, Inc.*, 181 F.Supp.2d 485, 493 (D. Md. 2002) ("The word 'nigger' is more than [a] 'mere offensive utterance' . . . . No word in the English language is as odious or loaded with as terrible a history"). The word harkens to this nation's most morally reprehensible hour and understandably inflames the emotions of anyone who hears it.

Brown may be correct that use of the epithet will be relevant in deciding whether defendants discriminated against him. The court concludes, however, that the likelihood of unfair prejudice arising from the use of epithet at trial substantially outweighs its probative value. As noted, Rule 403 precludes evidence that has an undue tendency to suggest decision on an improper basis, such as an emotional basis. Given the history associated with the term, it is likely mere utterance of the word will inflame jurors' emotions and invite them to decide the case on an emotional basis, rather than on the basis of the facts presented at trial. Conversely, any probative value associated with use of the epithet will remain if the parties refer to the term in a neutral fashion. Thus, to the extent that evidence concerning use of the term is otherwise found to be relevant and admissible, the parties are directed to use the terms "racial epithet," "racial slur," or "N-word."

### D.   Defendants' Motion *in Limine* to Exclude Evidence of Brown's Popularity or Qualifications

Defendants next move to exclude evidence of Brown's popularity and/or qualifications as a golf instructor.[80] Defendants do not identify all of the evidence they seek to exclude; they note,

---

[80]Popularity MIL at 1.

however, that they wish to preclude Brown's counsel from "eliciting testimony [as] to whether Plaintiff is the most popular golf instructor at Woodley Lakes," and concerning the fact "that Plaintiff started playing golf when he was seven years old, has been trained by professionals, and has coached numerous high school students and younger children."[81]  Defendants assert that the evidence is irrelevant and is likely to confuse and mislead the jury.[82]  Brown counters that the evidence is relevant to show that he was making frequent use of the driving range and gave good lessons.[83]  Additionally, he contends his popularity as a golf instructor makes it more likely that Woodley Lakes staff thought he was giving a golf lesson when in fact he was just practicing his swing.[84]  Finally, Brown asserts that his popularity as a golf instructor is probative of his economic damages.[85]

        To prevail on his Unruh Civil Rights Act and § 1983 claims, Brown must prove that defendants discriminated against him on the basis of race.  See *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (to state a Fourteenth Amendment equal protection claim under 42 U.S.C. § 1983, plaintiff must show that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class); *Wilkins-Jones v. County of Alameda*, 859 F.Supp.2d 1039, 1048 (N.D. Cal. 2012) (stating that the elements of an Unruh Act claim are: (1) that defendants discriminated against plaintiff and denied him full and equal access to the facilities, privileges, and services of a business establishment; (2) that plaintiff's race was a motivating factor; (3) that the discrimination was arbitrary; and (4) that defendants' wrongful conduct caused injury, damage, loss, or harm, citing *Johnson v. Beahm*, No. 2:11-CV-0294-MCE-JFM, 2011 WL 5508893, *4 (E.D. Cal. Nov. 8, 2011)).

---

[81]*Id.* at 2.

[82]*Id.*

[83]Popularity Opp. at 2-3.

[84]*Id.*

[85]*Id.*

16

As the court noted in its order on defendants' motion for summary judgment, Brown has raised triable issues of fact as to whether Ward's decision to allow Hinds and Riggs to pay a monthly rental rate while denying Brown the same opportunity; Ward's decision to suspend Brown for purported non-payment of rental fees; and Aubrey's practice of approaching Brown during lessons to request payment were motivated by discriminatory intent.[86]

The evidence defendants seek to exclude is relevant and otherwise admissible.  Evidence that Brown was "seven years old when he began playing golf, has been trained by professionals, and has coached numerous high school students and younger children" is relevant background information about Brown's association with golf and how he came to give golf lessons at Woodley Lakes.  See, e.g., *Lewis v. United States*, No. 02-2958-STA-egb, 2014 WL 3878894, *1 (W.D. Tenn. Mar. 25, 2014) ("[T]he Court finds that Lewis may provide evidence in the form of very general background information about how he came to be associated with VisionAmerica Inc. and his involvement with the company"); *Carlson v. Banks*, No. 05 C 1650, 2007 WL 5711692, *6-7 (N.D. Ill. Feb. 2, 2007) ("Plaintiff's sixth motion in limine appears to seek to exclude certain background or biographical evidence concerning Defendant Police Officer Banks – presumably of promotions or commendations as a police officer. . . .  Witnesses in this Courthouse typically offer various limited background information at the beginning of their respective testimonies.  This process is subject to reasonable limits concerning the length and substance of such testimony. Thus, a witness is invariably allowed to testify, if he or she chooses, that he or she is married, went to college, has children, has been promoted during their career, etc. – even if those issues are not really being litigated in the case – as part of a brief, general, introduction to his or her testimony"); see also *United States v. Nguyen*, 997 F.Supp. 1281, 1294 (C.D. Cal. 1998) ("'Where the exclusion of proffered evidence will leave a chronological and conceptual void in the account of events surrounding the matters in issue, the evidence should be allowed,'" quoting Charles E. Wagner, FEDERAL RULES OF EVIDENCE CASE LAW SUMMARY 115 (1997-1998)).  For this reason, defendants' motion must be denied.

---

[86]Order at 41, 50-53.

1    Other than providing general background information concerning Brown, however, the

2    evidence is of limited relevance, as it makes it no more or less probable that defendants were

3    motivated by discriminatory intent.  Thus, the court cautions Brown that if too much time is

4    consumed on background information, the court will entertain objections by defendants in order

5    to place reasonable limits on the length and substance of the testimony.  See *Lewis*, 2014 WL

6    3878894 at *1 ("The court finds that specific evidence about the number of Lewis's adopted

7    children, the charitable organizations he and his wife are involved with, and the donations they

8    have made are inadmissible, because they are not relevant to the questions being presented to the

9    jury.  Whether Lewis has adopted children, supported charities, or made donations does not make

10   it more or less probable that Lewis is personally liable for trust fund recovery penalties under 26

11   U.S.C. § 6672.  Furthermore, even if the evidence were relevant, it is unfairly prejudicial because

12   it could mislead the jury or nullify the jury's verdict.  This danger substantially outweighs any

13   probative value"); *Carlson*, 2007 WL 5711692 at *7 ("That said, the Court does not suggest that

14   Officer Banks will be permitted to engage in a extended exegesis concerning the list of any

15   commendations he has received.  Nor will he be allowed to relate the details of incidents that led

16   to such commendations, or the written substance of any awards he received (*that* would be

17   hearsay).  Within such parameters, Plaintiff's motion is denied").  Accordingly, the court's denial

18   of defendants' motion is without prejudice to their ability to object to the extent of the testimony,

19   if appropriate, at trial.

20   Defendants also request that the court exclude evidence of Brown's popularity as a teaching

21   professional at Woodley Lakes because such evidence is not probative as to whether he suffered

22   discrimination based on race.[87]  Brown argues that "an inference can be drawn that by virtue of

23   his popularity, Brown was making frequent use of the driving range and gave good golf lessons."[88]

24   While the evidence would certainly support such an inference, his frequent use of the range does

25   not tend to make it more or less probable that Brown's *race* was a motivating factor in the

26   _____

27   [87]Popularity MIL at 4.

28   [88]Popularity Opp. at 2.

purportedly differential treatment he experienced at Woodley Lakes. Brown argues that "[a]nother inference is that with so many people around [Brown], someone could be mistaken thinking he was giving a lesson [when] he was simply hitting balls."[89] He contends that this inference is relevant because one of the issues to be tried is whether Brown failed to pay for time on the driving range.[90]  The court cannot agree.  Brown's popularity as a teaching professional has no tendency to make it more or less likely that Aubrey's and Ward's allegations concerning unpaid fees were motivated by his race.  Nor does generalized evidence concerning Brown's popularity as a teaching professional logically give rise to an inference that people crowded around him every time he was on the course.  Brown's claim against Aubrey, moreover, asserts that Aubrey came up to him *while he was giving a lesson* to demand payment of rental fees.  To the extent Brown now suggests that he was not giving a lesson when Aubrey approached him and thus did not owe any fees, this is fundamentally inconsistent with the contention he has advanced in this case. With respect to Brown's claim against Ward, the court similarly concludes that Brown's popularity is irrelevant in assessing whether his suspension was discriminatory.  Whether Brown *actually* owed fees is immaterial; rather, the question the jury must decide is whether Ward *believed*, even if incorrectly, that Brown had unpaid rental fees or whether he suspended Brown on the basis of his race.  Evidence making it more likely that Brown was not giving lessons, but was just hitting balls, is not probative of the reasons for his suspension, as it is undisputed that Ward believed that Brown had unpaid rental fees.[91]  For all of these reasons, the court concludes that evidence of Brown's popularity is not probative of whether he did or did not owe fees for giving lessons.

---

[89]*Id.* at 2-3.

[90]*Id.* at 3.

[91]See SUF, ¶ 26.

Brown also asserts, however, that evidence of his popularity as a golf instructor is probative of his economic damages.[92] He contends such evidence shows he would have benefitted from the monthly rate offered Riggs and Hinds because it would have "solidified his client base."[93] Defendants argue that evidence of Brown's popularity does not support his economic damages claim because he did not immediately take advantage of the monthly rate when it was offered to all teaching professionals in January 2013.[94] This may be fodder for cross-examination, but it does not make the evidence irrelevant or inadmissible. His popularity as a golf instructor makes it more likely that he would have benefitted financially from being able to pay a monthly rate rather than an hourly rate for each lesson. More fundamentally, his popularity as a golf instructor – e.g., the average number of lessons he gave in a week or a month – is probative of his economic damages and lost earnings during the period of time Brown was unable to teach as a result of his suspension.[95]

Defendants argue that, even if the evidence is relevant, it is unfairly prejudicial because it could mislead the jury and confuse the issues.[96] The court cannot agree. Rule 403 favors admissibility, and permits exclusion only when the probative value of evidence is *substantially* outweighed by the unfair prejudice that may result from admitting it. See FED.R.EVID. 403. As noted, the evidence Brown seeks to admit is potentially probative of his claim that defendants demanded he pay for lessons he had not given as a means of discriminating against him, as well as his measure of economic damages. The court is not persuaded that the jury will decide the case against defendants on an improper basis if the evidence is admitted. In addition, given the relevance of the evidence, any possible prejudice will not substantially outweigh its probative

[92]*Id.*

[93]*Id.*

[94]Defendants' Joint Reply to Plaintiffs' Opposition to Motion *in Limine* (#3), Docket No. 84 (Oct. 10, 2014) at 4.

[95]See FAC at 7.

[96]Popularity MIL at 4.

1   value.  The court, therefore, denies defendants' motion to exclude evidence or argument related

2   to Brown's popularity and qualifications as a golf instructor at Woodley Lakes.

3       **E.**      **Defendants' Motion** *in Limine* **to Exclude Evidence of the Incident Between**

4                **Brown and Tim Cotti**

5       Defendants next seek to exclude evidence of a conflict between Brown and a fellow

6   teaching professional, Tim Cotti, that took place shortly after the City took over the at Woodley

7   Lakes golf course.[97]  They argue that because the court's summary judgment order limited the

8   basis of Brown's Unruh Act and § 1983 claims to Ward's decision to deny Brown a monthly rental

9   rate, his decision to suspend Brown, and Aubrey's decision to approach Brown to demand

10  payment while he was giving lessons, he should be limited to offering evidence probative of those

11  purported types of discrimination.[98]  The court agrees that evidence related to the incident between

12  Brown and Cotti has no relevance to the claims to be tried; for reasons stated in the summary

13  judgment order, Brown failed to raise triable issues of fact as to whether Cotti's behavior or

14  defendants' subsequent investigation of the incident constituted instances of intentional

15  discrimination against Brown.[99]  Accordingly, he may not now present evidence and argument

16  suggesting that the incident on City property and the subsequent City investigation violated his

17  constitutional rights.

18      Brown's opposition to defendants' motion, moreover, reveals that that is precisely how he

19  would use the evidence at trial.  Brown contends that evidence of the Cotti incident and

20  defendants' subsequent investigation is relevant to show that "Woodley Lakes made racially biased

21  decisions" because defendants did not suspend Cotti for his use of the epithet.[100]  Brown asserts

22

23      [97]Cotti MIL at 1.

24

25      [98]Cotti MIL at 4.

26      [99]Order at 29 ("Brown has proffered no evidence that defendants 'condoned' Cotti's use

27  of racial epithets, or that Aubrey falsified his investigation of the incident.  Thus, Brown has failed
    to demonstrate that these allegations should be presented to the jury for decision").

28      [100]Cotti Opp. at 2-4.

1   that "the City condoned Cotti's assault on its property," and "approved Cotti's actions by not

2   taking him to task and dealing with Mike Brown."[101]   These were exactly the issues as to which

3   the court  concluded that Brown had not raised triable issues of fact.[102]   Thus, the introduction of

4   evidence or argument concerning the incident and investigation will not be relevant, and will serve

5   only to confuse the issues and mislead the jury.   The court therefore grants defendants' motion

6   *in limine* to exclude evidence of the incident between Brown and Cotti and the subsequent

7   investigation.

8     **F.     Defendants' Motion *in Limine* to Exclude Evidence Regarding Brown's PGA**

9           **Registration Form Being Returned by John Ricks**

10          Defendants also seek to exclude evidence that John Ricks returned Brown's PGA form to

11   him in February 2014, purportedly because Ricks' supervisor, who had authority to complete the

12   form, was on vacation.[103]   Defendants argue that evidence of the incident between Brown and

13   Ricks is irrelevant to any issue in the case because the form was submitted and returned in

14   February 2014 – nearly one year after Brown was allegedly subjected to discrimination, and some

15   seven months after Brown filed this action.[104]   Brown argues that the motion should be denied

16   because: (1) defendants fail to proffer his testimony concerning the PGA application and incident

17   with Ricks; and (2) "the difficulties and annoyances associated with Brown's PGA application are

18   probative of the racial discrimination issues in this case and the ongoing treatment of Michael

19   Brown."[105]

20          As respects Brown's first contention that the motion must be denied before reaching its

21   merits because defendants failed to provide a "reasonable presentation of the issue," the court

22

23   _____

          [101]*Id*. at 3.

24

25        [102]See Order at 29.

26        [103]PGA Registration MIL at 1.

27        [104]*Id*. at 1-4.

28        [105]PGA Registration Opp. at 1-2.

notes that he attached evidence and deposition testimony to his opposition. Based on the evidence submitted by both parties, the court has an adequate factual basis upon which to make a decision. It thus turns to the merits of the motion.

Brown's second argument does not persuade the court that evidence of events surrounding his PGA application in 2014 are probative of the issues to be tried in this case. The court has concluded that the issues to be tried concern: (1) Ward's decision to give Hinds and Riggs a monthly rate, while denying a monthly rate to Brown; (2) Ward's decision to suspend Brown's teaching privileges for purported non-payment of rental fees; and (3) Aubrey's decision to approach Brown while he was giving lessons to request payment of fees. Each of these incidents occurred in late 2012 or early 2013, one year or more before Brown submitted the PGA registration form and had it returned. He does not explain why his encounter with non-defendant Ricks makes it more likely that Ward's or Aubrey's decisions were motivated by Brown's race. Rather, he appears to argue that the incident is another example of discriminatory treatment at Woodley Lakes. If Brown wished to base his Unruh Act and § 1983 claims on the encounter with Ricks, he should have raised the matter in an amended pleading before dispositive motions were heard. Because he did not, he cannot raise the issue at trial. Because evidence concerning the Ricks incident is not probative of the issues to be tried, the court grants defendants' motion to exclude the evidence.

### G.     Defendants' Motion *in Limine* to Exclude Evidence Concerning David Aubrey's Transfer to a Different Golf Course

During their meeting in advance of the pretrial conference, the parties agreed that they would not mention the fact that David Aubrey had been transferred from one City golf course to another following the purported incidents of racial discrimination in this case.[106]  Nonetheless, defendants filed a motion *in limine* seeking to exclude any evidence concerning the reasons for the

---

[106]See Declaration of Yvette Davis re: Motions *in Limine*, Docket No. 56 (Sept. 29, 2014), ¶ 5(c); Aubrey Transfer Opp. at 2.

transfer.[107]   Brown states that, consistent with the parties' agreement, he will neither offer evidence of the transfer or make arguments based on it.[108]   He clarifies that he seeks to present evidence and argument concerning Siebrandt's authority to address issues she has with subordinates – which allegedly includes requesting that the employee in question be transferred.[109] Defendants reiterate in reply that Aubrey's transfer is not related to Brown's claims and is thus irrelevant.[110]

It is clear that Brown does not oppose exclusion of evidence concerning David Aubrey's transfer.  Instead, he seeks to elicit testimony concerning Siebrandt's general authority over subordinates and the means available to address misconduct.  Brown states:

> "Plaintiff will, however, address Penny Siebrandt's authority to deal with
> subordinates, like Mr. Aubrey, who refuse to abide [by] City rules and policies or
> her directives.  That range of authority included seeking a transfer of Mr. Aubrey
> for chronic rule violations."[111]

---

[107]Aubrey Transfer MIL at 2-3 ("Plaintiff's counsel, however, consistently asked witnesses – including witnesses who admitted they did not know why Aubrey was transferred and were just speculating – why Aubrey was transferred from Woodley Lakes Golf Course to another golf course in March of 2013.  Aubrey's transfer had no relation to this matter.  Plaintiff's counsel, however, has suggested that it has to do with personality conflicts or Aubrey's performance despite the fact that there is no admissible evidence to indicate such.  The reasons for Aubrey's transfer [are] irrelevant and can only be used to confuse and mislead the jury as to the issues at hand and cause undue delay and waste of time.  Accordingly, such evidence must be excluded").

[108]Aubrey Transfer Opp. at 2 ("The defendants requested and plaintiff agreed during a meet and confer that in his case-in-chief, Brown would not offer evidence or make argument about David Aubrey's transfer to another City Golf course after Michael Brown filed a government claim and lawsuit over his discrimination at Woodley Lakes Golf Course").

[109]*Id.* at 2-3.

[110]Defendants' Reply to Opposition to Motion *in Limine* (#5), Docket No. 87 (Oct. 10, 2014) at 2-3.

[111]Aubrey Transfer Opp. at 2-3.

Based on this statement, the court understands defendants' concern – although Brown asserts that he wishes to elicit testimony concerning Siebrandt's authority to deal with subordinates, his statement of the issue is couched in terms of Aubrey and his transfer.   As defendants seek an order excluding "evidence, testimony, and/or argument regarding the reasons why Davi[d] Aubrey was transferred to another golf course,"[112] and Brown agrees he will not elicit such evidence or offer such argument,[113] the court grants defendants' motion *in limine*.   In eliciting that Siebrandt had authority to transfer subordinates who violated City policies or rules, Brown's counsel *may not* reference Aubrey.

## H.   Defendants' Motion *in Limine* to Exclude Evidence of Discussions Concerning Brown's Live Scan Documentation

Defendants next seek to preclude evidence concerning Brown's Live Scan documentation.[114]   Specifically, they seek to prevent the introduction of evidence concerning an encounter between Brown, Aubrey, and a Woodley Lakes employee named Pam Aurora in which Aubrey allegedly accused Brown of not filing complete Live Scan documentation; Aubrey's statement was incorrect because it was later discovered that Brown's completed application had been misplaced.[115]   Defendants contend that any evidence related to the incident or Brown's Live Scan documentation is irrelevant under Rules 401 and 402 of the Federal Rules of Evidence because the court concluded that Brown failed to raise triable issues of fact concerning the Live Scan documentation.[116]   Brown counters that the evidence is "entirely relevant to [defendants'] intentional discrimination. . . ."[117]   He asserts that the fact Aubrey accused him of not completing

---

[112]Aubrey Transfer MIL at 7-8.

[113]Aubrey Transfer Opp. at 2.

[114]Live Scan MIL at 1.

[115]*Id*. at 2-3.

[116]*Id*.

[117]Live Scan Opp. at 2-3.

1   the application rather than calling an operator to verify Brown's Live Scan status is probative of

2   Aubrey's campaign to have Brown removed from Woodley Lakes because of his race.[118]   The

3   court agrees with defendants that the motion *in limine* must be granted.

4       In its order concerning defendants' motion for summary judgment, the court stated:

5       "Regarding Brown's application, it is undisputed that his application to continue

6       services at Woodley Lakes was misplaced by a starter and was not discovered until

7       Brown spoke with Aubrey a few weeks later.  Brown offers nothing more than

8       speculation as to why this constituted discrimination.  He asserts it is unlikely the

9       application was misplaced because 'the file was in the [starter] office, at Woodley

10      Lakes, not a remote location,' and also [that] 'Ward did not know what to make of

11      the explanation' that it had been misplaced.  He proffers no evidence that could

12      support an inference that anyone deliberately misplaced the application or

13      deliberately overlooked it, however.  This does not suffice to create a genuine issue

14      for trial."[119]

15      As with the Cotti incident, the court has concluded that Brown failed to adduce evidence

16  raising triable issues of fact as to whether the misfiling of his Live Scan application constituted

17  intentional discrimination.  The court did not, however, directly address the incident in which

18  Aubrey accused Brown of lying about the Live Scan documentation in its summary judgment

19  order.  The question that must be examined, therefore, is whether Aubrey's conduct during the

20  incident could give rise to an inference that he harbored racial animus toward Brown.  The

21  evidence shows that Aubrey accused Brown of lying; there is no suggestion that he used racial

22  slurs during the conversation or that he treated other professionals whose Live Scan documentation

23  he believed was incomplete differently than he did Brown.  If there were no other evidence that

24  could support a finding that Aubrey acted with discriminatory intent, the court would have to

25  conclude that the incident is not probative of racial animus.  In the employment discrimination

26  _____

27  [118]*Id.* at 3.

28  [119]Order at 29.

context, for example, courts routinely hold that abrasive workplace behavior by supervisors, standing alone, does not give rise to an inference of discrimination.  See, e.g., *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000) ("[B]oorish [statements] that do not relate to the [race] of the actor or of the offended party (the plaintiff), are not counted"); *Ellison v. BHBC Northwest Psychiatric Hosp.*, Civil Case No. 11–5106, 2013 WL 1482199, *12 (E.D. Pa. Apr. 9, 2013) ("Plaintiff claims that Kaun's harsh treatment of her amounted to a hostile work environment motivated by racial animus.  Based on the analysis above, Plaintiff and Kaun were acutely incompatible co-workers, and Plaintiff endured an extremely difficult work environment because of Kaun's conduct.  At the same time, the above analysis also reveals insufficient evidence to support a reasonable inference that Kaun's behavior towards Plaintiff was motivated by race"); *Woods v. Enlarged City School Dist. of Newburgh*, 473 F.Supp.2d 498, 522 (S.D.N.Y. 2007) ("Although there is no evidence of racial bias or animus, there is substantial evidence suggesting that plaintiff's problems stemmed from abrasive relations with several of her coworkers").  Here, however, the court has determined that the jury must decide whether Aubrey's demands, during lessons and in front of clients, that Brown pay rental fees were racially motivated.  It has also concluded that the jury must decide whether Aubrey's statement that Brown was suspended because his Live Scan documentation was incomplete – at a time when he knew the documentation had been submitted – is evidence of discrimination.  Given that there is *some* evidence of potentially discriminatory conduct in the record, the question is whether Aubrey's purported hostility during his meeting with Brown concerning the Live Scan documentation is admissible because it could, in the mind of the jury, support an inference of discrimination.  See, e.g., *E.E.O.C. v. WC&M Enters., Inc.*, 496 F.3d 393, 400-01 (5th Cir. 2007) (concluding in a case alleging a hostile work environment that "a factfinder could reasonably conclude a coworker's frequent banging on the glass partition of the plaintiff's office was motivated by animus related to the plaintiff's national origin because that same coworker had constantly called the plaintiff 'Arab' for approximately a year"); *Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) ("Facially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder

could conclude that they were, in fact, based on" the protected characteristic); see also *Woods v. Newburg Enlarged City Sch. Dist.*, 288 Fed. Appx. 757, 759 (2d Cir. Aug. 12, 2008) (Unpub. Disp.) ("*Alfano*'s observation that incidents that are facially sex-neutral may sometimes be used to establish a course of sex-based discrimination presumed evidence of multiple acts of harassment, some overtly sexual and some not").

While the evidence of purportedly discriminatory conduct by Aubrey is not as clear-cut as that proffered in certain of these cases, it is evidence that the court concluded could support a jury verdict in Brown's favor against him.  Given that fact, the court will permit Brown to adduce evidence of Aubrey's accusation that he was lying about having submitted the necessary Live Scan documentation, and his reaction – i.e., storming out of the room – when he was informed that in fact the City had the documentation in hand and simply misplaced it.  Defendants' motion to exclude such evidence is therefore denied.  The court cautions Brown, however, that he may not ask questions or offer argument suggesting that the City intentionally misplaced his Live Scan documentation.

Additionally, as the court noted in its summary judgment order, Aubrey testified that Brown was suspended because he failed to comply with the City's Live Scan requirement even though Aubrey knew that Brown's application had been misplaced and that Brown had satisfied the requirement before the suspension letter was sent.  To the extent Aubrey contributed to, or participated in, the decision to suspend Brown, evidence that he knew, at the time the suspension letter was sent, that Brown had complied with the requirement, is relevant to show that his stated reason for recommending that Brown be suspended was pretextual.  Such evidence, moreover, will not be unfairly prejudicial and will not mislead the jury.  The fact that it may be damaging to defendants' case does not constitute unfair prejudice.  See *Old Chief*, 519 U.S. at 180 (unfair prejudice means an "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one," quoting FED.R.EVID. 403, Advisory Committee Notes, 1972 Proposed Rules).  See also *United States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir. 1994) ("The damage done to the defense is not a basis for exclusion; the question under Rule 403 is 'one of "unfair" prejudice—not of prejudice alone'"); *Dollar v. Long Mfg., N. C., Inc.*, 561 F.2d 613,

618 (5th Cir. 1977) ("'[U]nfair prejudice' as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party.  Virtually all evidence is prejudicial or it isn't material.  The prejudice must be 'unfair'"), cert. denied, 435 U.S. 996 (1978).   To the extent defendants seek to preclude this evidence, therefore, their motion is denied.

## I.   Defendants' Motion *in Limine* to Exclude References to Bob Davis

Defendants also argue that evidence concerning an encounter between Aubrey and Bob Davis must be excluded because it is irrelevant, will mislead the jury and waste time.  They also assert that reference to the incident will violate Aubrey's constitutional right to privacy.[120]  Brown argues that the evidence is "representative of a culture of corruption and failure to abide the City's rules and policies."[121]  He contends that Davis, the City's maintenance supervisor, told his friends they could receive discounted greens fees at Woodley Lakes.[122]  When Aubrey refused to give Davis' friends the discounted rate, Siebrandt allegedly "counseled" and reprimanded him.[123]  Brown proffers a July 27, 2012, email from Aubrey as evidence of the Davis incident and the reprimand.[124]

As an initial matter, the evidence Brown has adduced indicates that Aubrey was counseled after he sent Davis an email defending the manner in which he had handled a maintenance issue; the email does not indicate that he was counseled for refusing to provide a discounted rate to Davis' friends.[125]  The only reference in the email to the discount is at the end of a long, stream-

---

[120]Davis MIL at 1.

[121]Davis Opp. at 2.

[122]*Id.*

[123]*Id.*

[124]*Id.*, Exh. 1.

[125]*Id.* at 1 ("Penny, I am sending this to document that *you told me that there would be repercussions*, which any fair thinking person would take to mean disciplinary action.  *This threat was made due to my sending of an email to Bob Davis defending myself because of an equipment breakdown/malfunction resulting in a worker (Laura Lindsay) being injured trying to free a stuck wheel on said equipment*"(emphasis added)).

1  of-consciousness paragraph – far removed from any mention of discipline.[126] Evidence of

2  Aubrey's reprimand for sending an email to Davis regarding a maintenance issue, even if it

3  includes a passing reference to Davis' request that his friends receive discounted greens fees, does

4  not support Brown's assertion that there was a "culture of corruption [at Woodley Lakes] and [a]

5  failure to abide [by] the City's rules and policies." More fundamentally, there is no apparent link

6  between any "culture of corruption" and racial discrimination. The evidence thus has no

7  probative value. The fact that Aubrey did not give Davis' friends a discounted rate for Davis does

8  not give rise to an inference that he likely discriminated against Brown on the basis of his race.

9  Even if the evidence were probative of Brown's claims, moreover, the risk of unfair

10 prejudice resulting from confusion of the issues and wasted time would substantially outweigh any

11 slight probative value the evidence might have. Brown is suing defendants – not Davis – for

12 intentional racial discrimination. Permitting Brown to introduce evidence with no relation to him,

13 teaching professionals at Woodley Lakes, or the allegedly discriminatory practices at issue is likely

14 to cause jury confusion and distract jurors from resolving the actual issues in the case.

15 For all these reasons, the court grants defendants' motion *in limine* to exclude references

16 to the incident between Aubrey and Bob Davis.

17 **J.      Defendants' Motion *in Limine* to Exclude Evidence Concerning Penny**

18 **Siebrandt Seeking an Asian Golf Instructor for a Different Golf Course**

19 Brown intends to introduce evidence of an email Penny Siebrandt sent to the golf manager

20 at Rancho Park Golf Course concerning the possibility that she would hire an Asian golf instructor

21 to work there.[127] The email, sent April 29, 2013, states:

22 "Only approved instructors are allowed to teach at our driving ranges. 'Approved'

23 means they must now be PGA or LPGA pros and approved by myself and James.

24 We are allowing a maximum of 9 pros at each facility. Currently, you have 8 with

25 

26 [126]*Id.* at 1-2 ("Bob Davis 2 days ago telling 3 people to tell me to give them a discount.
It was entered into the computer but I did not notice it until they gave me a hard time and left the

27 window").

28 [127]Siebrandt Opp. at 1-2.

the 2 new Pros and I am considering a 9th.  I'm looking over his resume now.  He is an Asian pro, which we don't have there so I think that would be a good addition.  Ask Don first if he is PGA, if so let him know we may be topped out at 9 if I approve Jeong Park."[128]

Brown argues that the email is evidence that Siebrandt is "presumptuous, but it is also probative of racial distinctions that were made and accepted by Siebrandt and the people she worked with."[129]

Defendants assert that the email is irrelevant.  They contend that "[e]vidence about Penny Siebrandt's thoughts about how the Rancho Park clientele would benefit from the addition of an Asian golf professional is not probative [of] the issues at hand and has no bearing on Plaintiff's actual claims."[130]  Defendants argue that because Brown has not taught at Rancho Park Golf Course, and has not included allegations about the course in his complaint, evidence concerning Siebrandt's hiring practices there is not probative of his claims.  As noted, evidence is relevant if: (1) it has *any tendency* to make a fact more or less probable than it would be without the evidence; and (2) the fact is *of consequence in determining the action*.  See FED.R.EVID. 401.  Here, the fact that Siebrandt took the race of teaching professionals into account when making hiring decisions at Rancho Park has some tendency to make it more likely that she and/or her subordinates took race into account when making decisions concerning teaching professionals at Woodley Lakes.  Because Siebrandt's and defendants' motivations are facts of consequence, the evidence is relevant.

Defendants also assert that the evidence should be excluded under Rule 403 because it is unfairly prejudicial, likely to confuse and/or mislead the jury, and result in undue delay and

---

[128]*Id.*, Exh. 1.

[129]*Id.* at 2.

[130]Siebrandt MIL at 2-3.

wasted time.[131]  Defendants contend the evidence is unfairly prejudicial because it is "a textbook example of evidence that would be offered at trial by Plaintiff in an attempt to induce a verdict against Defendants on a purely emotional, yet not relevant, basis."[132]  Defendants do not explain why the evidence will induce an emotional reaction from the jury.  While the jury might view the evidence in the manner Brown does – i.e., as proof that instructors' race played a part in the decisions Siebrandt made – if it did, this would not constitute unfair prejudice, even though it might be unhelpful to defendants at trial.  See *Old Chief*, 519 U.S. at 180 ("'Unfair prejudice' within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").  The jury might just as easily conclude that Siebrandt was concerned with ensuring racial balance among the teaching staff at City courses.  The evidence is not likely to mislead or confuse the jury, as it will be apparent that it is being offered as circumstantial evidence that race affected defendants', or at least Siebrandt's, decisionmaking.  The court thus denies defendants' motion to exclude evidence concerning Siebrandt's email referencing the possibility of hiring an Asian golf instructor at Rancho Park.

**K.    Defendants' Motion *in Limine* to Exclude David Aubrey's Employment Issues**

Defendants next seek to exclude evidence of Aubrey's employment issues.[133]  They do not describe the specific evidence they wish to preclude; they merely reference evidence related to "all [of Aubrey's] employment and personnel issues" while he was employed by the City.[134]  Defendants assert that any evidence "outside the scope of Plaintiff's claims both in terms of subject matter and time" should be excluded as irrelevant, unduly prejudicial, improper character evidence, and violative of Aubrey's privacy rights.[135]  Brown counters with similarly conclusory

---

[131]*Id.* at 3-4.

[132]*Id.* at 4.

[133]Aubrey Employment MIL at 1.

[134]*Id.*

[135]*Id.*

characterizations of the evidence at issue.  He asserts that the evidence will demonstrate "Aubrey's disregard[ ] [for] interpersonal rules that exist in the workplace" and show his "attitude toward his subordinates, women and African-Americans."[136]  He also contends the evidence is relevant because "Aubrey's personnel issues" purportedly show his unwillingness to enforce policies or procedures governing staff members and patrons at Woodley Lakes, and the fact that he ran the property without regard for the City's anti-discrimination policies.[137]

The court lacks sufficient information to decide defendants' motion.  It therefore directs Brown to make an offer of proof no later than **November 3, 2014**, concerning the evidence of Aubrey's personnel issues that he seeks to introduce.  The offer of proof should include a statement as to why Brown believes the evidence is relevant.  Defendants may file a response no later than **November 7, 2014**, addressing why the specific evidence Brown seeks to admit is inadmissible.  See *Carpenter v. Forest Meadows Owners Ass'n*, No. 1:09-CV-01918-JLT, 2011 WL 3207778, *1 (E.D. Cal. July 27, 2011) ("Motions in limine that seeks exclusion of broad and unspecific categories of evidence . . . are generally disfavored.  Courts have recognized that it 'is almost always better situated during the actual trial to assess the value and utility of evidence'" (citation omitted)); *Green v. Baca*, 226 F.R.D. 624, 644 (C.D. Cal. 2005) ("Nonetheless, the court has no information regarding the nature of the personnel information about which plaintiff seeks to examine defense witnesses.  Some aspects of the witnesses' employment history may well be relevant in assessing their credibility and/or as a form of impeachment evidence.  Until plaintiff specifies the portions of the witnesses' employment history that he seeks to use, . . . the court cannot determine the relevance of the information (generally or for impeachment purposes).  Nor can it assess whether the probative value of the information is outweighed by its prejudicial impact.  Plaintiff is accordingly directed to make an offer of proof, outside the presence of the jury, regarding any employment history evidence he seeks to use, so that the court may determine

---

[136]Aubrey Employment Opp. at 3-4.

[137]*Id.* at 4.

33

relevance under Rule 402 and prejudice under Rule 403.  Defendant's motion for a blanket order excluding all such evidence . . . is denied").

**L.    Defendants' Motion *in Limine* to Exclude Evidence that the Court Deemed Irrelevant and Lacking in Merit in Its Order on Defendants' Motion for Summary Judgment**

Defendants next assert that any evidence that the court "deem[ed] irrelevant and lacking [in] merit" in its order on defendants' motion for summary judgment should be excluded at trial.[138] Defendants argue that any evidence, argument or testimony concerning (1) whether Brown was permitted to inspect the course; (2) whether his Live Scan application was misfiled; (3) whether defendants condoned the use of Cotti's racial epithets; and (4) whether Aubrey falsified his investigation of the exchange between Brown and Cotti is irrelevant because the court concluded that Brown had failed to raise triable issues of fact concerning those matters.[139]  Brown does not respond to defendants' argument; he asserts only that the motion is a "shotgun approach to evidence exclusion" that should be denied because defendants did not attach the evidence they seek to exclude to the motion.[140]  Defendants, however, identify four specific issues concerning which they seek to exclude evidence.[141]

In its summary judgment order, the court found that Brown had failed to adduce evidence raising triable issues concerning the fact (1) that Brown was not permitted to inspect the golf course; (2) that his Live Scan application was deliberately misfiled; (3) that defendants condoned Cotti's use of racial epithets; and (4) that Aubrey falsified his investigation into the incident between Cotti and Brown.  It held that Brown could not argue to the jury that these matters were indicative of defendants' intent to discriminate against him on the basis of race.  Consequently, the court concludes that evidence concerning these matters is irrelevant to the issues to be tried

---

[138]MSJ Order MIL at 1.

[139]*Id*. at 1-2.

[140]MSJ Order Opp. at 2.

[141]MSJ Order MIL at 1-2.

and would have the tendency to confuse the jury and waste time.  Accordingly, the court grants defendants' motion to exclude evidence and argument concerning the fact that Brown was not permitted to inspect the golf course, that his Live Scan application was deliberately misfiled, that defendants condoned Cotti's use of racial epithets, and that Aubrey falsified his investigation of the Cotti incident.

Defendants' request that the court exclude "material" facts it found irrelevant in its summary judgment order;[142] this is an improper motion *in limine*.  Brown included more than two hundred facts in his separate statement of genuine issues.[143]  While defendants contend that many of the facts were immaterial to the court's summary judgment ruling, they identify no specific evidence or facts they seek to have excluded.  This aspect of defendants' motion is therefore denied.  See, e.g., *CadleRock Joint Venture, L.P. v. Royal Indem. Co.*, 872 F.Supp.2d 592, 602 (N.D. Ohio 2012) ("Further, with respect to CadleRock's arguments that I should exclude as hearsay Royal's evidence of misrepresentations by CMC, I decline to make such a finding at this time.  In advancing this argument, CadleRock has not identified any particular document or testimony, and I refuse to make evidentiary determinations in a vacuum.  CadleRock is free to raise specific objections to Royal's evidentiary proffers at trial"); *Carpenter*, 2011 WL 3207778 at *1 ("Motions in limine that seeks exclusion of broad and unspecific categories of evidence, however, are generally disfavored.  Courts have recognized that it 'is almost always better situated during the actual trial to assess the value and utility of evidence,'" citing *Sperberg v. The Goodyear Tire and Rubber Co.*, 519 F.2d 708, 712 (6th Cir. 1975); *Wilkins v. Kmart Corp.*, 487 F.Supp.2d 1216, 1218 (D. Kan. 2007); *Koch v. Koch Industries, Inc.*, 2 F.Supp.2d 1385, 1388 (D. Kan. 1998)); *id.* ("Therefore, when confronted with the situation, 'a better practice is to deal with questions of admissibility of evidence as they arise [in actual trial]' as opposed to tackling the matter in a vacuum on a motion in limine," quoting *Sperberg*, 519 F.2d at 712).

---

[142]MSJ Order MIL at 1.

[143]See generally SSF.

1

2

**M.      Defendants' Motion *in Limine* to Exclude Testimony that Brady Riggs and
Bobby Hinds Had a "Secret" Deal**

3      Defendants' next motion seeks to prevent Brown's counsel from characterizing the monthly

4   rate offered to Brady Riggs and Bobby Hinds as a "secret deal."[144]  Defendants contend that

5   evidence of a "secret deal" is "irrelevant to the determination of whether Plaintiff's civil rights

6   were violated."[145]  They assert that Brown's characterization of the deal as "secret" is inaccurate

7   and therefore likely to be "unduly prejudicial and cause undue delay and waste of time."[146]  Brown

8   counters that his characterization of the deal is not only accurate, based on undisputed evidence,

9   but also directly relevant in assessing whether Ward did not offer him a monthly rate because of

10  his race.[147]

11      Defendants argue the characterization is inaccurate because the court has already concluded

12  that Brown knew Riggs and Hinds were receiving monthly rates from the City; as a consequence,

13  they assert, the deal cannot have been "secret."[148]  Although it is undisputed that Brown learned

14  that Riggs and Hinds had been offered a monthly rate,[149] that fact alone does not make Brown's

15  characterization inaccurate.  In its summary judgment order, the court also noted that "[Ward] did

16  not tell Brown's attorneys he was considering similar requests [for a monthly rate] by Hinds and

17  Riggs," and "[t]he City did not advise any of the teaching professionals at Woodley Lakes in

18  writing that if they obtained PGA certification, they would be entitled to a monthly rental rate."[150]

19  The  undisputed  failure  to  inform  teaching  professionals  like  Brown  that  defendants  were

20

21      [144]Secret Deal MIL at 2.

22      [145]*Id.* at 3.

23      [146]*Id.*

24      [147]Secret Deal MIL at 2-3.

25      [148]*Id.*

26      [149]See Order at 10.

27      [150]See *id.* at 9-10.

28

negotiating a monthly rate for Hinds and Riggs – a rate that was eventually provided – provides some basis for Brown's characterization of the deal as "secret."

Moreover, the fact that the negotiations were not disclosed to Brown's attorneys when they met with Ward to request that he receive a monthly rate, and that the resulting arrangement was not disclosed to other teaching professionals is directly relevant to Brown's intentional discrimination claims.  As the court noted in its order on defendants' motion for summary judgment, such evidence makes it more likely that Ward's stated reasons for offering Hinds and Riggs a monthly rate were pretextual, and that his decision to deny Brown a monthly rate was motivated by discriminatory intent.[151]  Brown must make such a showing at trial to prevail on his Unruh Act and § 1983 claims. See *Barren*, 152 F.3d at 1194 (elements of a 42 U.S.C. § 1983 claim for a violation of the Equal Protection Clause of the Fourteenth Amendment); *Wilkins-Jones*, 859 F.Supp.2d at 1048 (elements of an Unruh Act claim).  Thus, the evidence is relevant. See FED.R.EVID. 401 ("Evidence is relevant if: it has any tendency to make a fact more or less probable than it would be without the evidence; and the fact is of consequence in determining the action").  The fact that defendants do not like the way Brown characterizes the arrangement does not provide a basis for refusing to allow his lawyer to argue his view of the facts to the jury.

Defendants also argue that references to a "secret deal" between Ward, Riggs, and Hinds should be precluded under Rule 403 because they will confuse and mislead the jury and will be

---

[151]See *id.* at 24 ("Brown proffers uncontroverted evidence that in February 2012, when Ward was considering Hinds' and Riggs' requests for a monthly rate, Brown's attorneys met with defendants and asked that he be permitted to pay a monthly rate.  Defendants refused to grant Brown's request and also failed to tell his attorneys that two other professionals had made a similar request.  Given that Hinds and Riggs first paid the monthly rate in March, a jury could infer that Ward did not mention their requests to Brown's attorneys because he knew, or was reasonably certain, that he was going to grant their requests, and did not want Brown to know of the differing treatment. . . .  Based on this evidence, a reasonable jury could conclude that Brown's race was a motivating factor in defendants' decision to deny Brown's request for a monthly rate while granting Riggs' and Hinds'"); *id.* at 25 ("[A] jury could conclude that defendants' failure to tell Brown's attorneys that Hinds and Riggs had requested a monthly rate is circumstantial evidence that defendants' refusal to give Brown a monthly rate, while approving one for two 'Caucasian looking' professionals, was based on his race and thus violated the Unruh Act").

prejudicial. Their argument is unpersuasive. Brown's description is based on undisputed evidence that Ward did not disclose his negotiations with Hinds' and Riggs' requests or his apparent intent to approve their request to Brown or his attorneys, and did not inform other teaching professionals in writing of the availability of a monthly rate. Defendants seek not to exclude the introduction of evidence, but to curtail the manner in which Brown's attorney argues that evidence to the jury. The jury will be able to distinguish argument and rhetoric from evidence. Defendants' attorneys, moreover, can argue that the deal was not secret, citing evidence they believe supports that conclusion. Given the probative value of the underlying evidence, and the small, if nonexistent, risk of prejudice or confusion, the court declines to preclude use of the term "secret deal" under Rule 403. Defendants' motion is therefore denied.

### N.     Defendants' Motion *in Limine* to Exclude Evidence of the Music to Which David Aubrey Listens and the Jokes He Has Heard

Defendants also seek to exclude evidence, questions, and argument concerning the types of music to which Aubrey listens and the kinds of jokes he has heard.[152] Defendants contend the fact that the music and jokes reference the N-word and that Aubrey has used the N-word before when singing along or telling jokes is irrelevant in assessing whether Brown has been suffered discrimination on the basis of race. They also assert that to the extent the evidence is relevant, its probative value is substantially outweighed by the danger of unfair prejudice and confusion of the issues.[153] Brown counters that evidence of Aubrey's use of the epithet is circumstantial evidence that Aubrey did not take the City's anti-discrimination policies seriously and that "he treated Mike Brown differently and badly because he was African American."[154]

The jury could view evidence that Aubrey used the epithet as probative of the fact that his decision to approach Brown and demand payment of rental fees was motivated by an intent to discriminate against Brown on the basis of his race. See, e.g., *Johnson v. Federal Express Corp.*,

---

[152]Aubrey Music MIL at 1-3.

[153]*Id.* at 1-5.

[154]Aubrey Music Opp. at 2-3.

1   No. 1:12-CV-444, 2014 WL 805995, *9 (M.D. Pa. Feb. 28, 2014) (concluding, in an

2   employment discrimination case, that evidence of racial slurs uttered by defendant in her personal

3   life outside work was relevant to intentional discrimination claims "because it increases the

4   likelihood of an improper, race-based reason for the differential treatment" of plaintiff and a co-

5   worker); *Thompson v. Harding University*, No. 4:06CV01653-WRW, 2007 WL 4335468, *1

6   (E.D. Ark. Dec. 11, 2007) (concluding that defendant's telling of racial jokes was relevant in a

7   case alleging racial discrimination); *Davis v. General Accident Ins. Co. of America*, No. CIV A

8   98-4736, 2000 WL 1780235, *7 (E.D. Pa. Dec. 4, 2000) ("The analysis changes when focusing

9   on the Defendant's alleged recent use of racial slurs. Discriminatory comments made in the

10   workplace are relevant circumstantial evidence probative of a decision maker's motivation in

11   making employment decisions. The Court finds that the same is true for racial slurs *made outside*

12   *of the workplace*. While the weight given to external comments will be less than that given to

13   workplace comments, the language itself represents relevant circumstantial evidence of the

14   decision maker's mindset" (emphasis added)); *Garvey v. Dickinson College*, 763 F.Supp. 799,

15   801 (M.D. Pa. 1991) ("In an employment discrimination case, evidence that, e.g., the defendant

16   has made disparaging remarks about the class of persons to which plaintiff belongs, may be

17   introduced to show that the defendant harbors prejudice toward the group. Such evidence is often

18   the only proof of defendant's state of mind, and if it were excluded, plaintiff would have no means

19   of proving that the defendant acted with discriminatory intent"). Use of the racial epithet, even

20   when singing a song's lyrics or telling a joke, makes it more probable that Aubrey's actions were

21   motivated by an intent to discriminate against Brown. See FED.R.EVID. 401 ("Evidence is

22   relevant if it has any tendency to make a fact more or less probable than it would be without the

23   evidence; and the fact is of consequent in determining the action").

24       Nor does the court believe that admission of the evidence will result in unfair prejudice.

25   The court is not persuaded the jury will decide the case against defendants on an improper basis

26   if the evidence is admitted. Rule 403 favors the admission of evidence, and permits its exclusion

27   only where the probative value of the proof is *substantially* outweighed by the unfair prejudice that

28   may result from admitting it. See *Deters v. Equifax Credit Info. Services, Inc.*, 202 F.3d 1262,

1274 (10th Cir. 2000) ("Evidence should be excluded under Rule 403 only if the probative value of the evidence is substantially outweighed by unfair prejudice.  In performing the 403 balancing, the court should 'give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value'"); see *United States v. Hearst*, 563 F.2d 1331, 1348-49 (9th Cir. 1977) ("By the choice of the term 'substantially outweighed,' there was adopted a basic policy favoring admissibility of relevant evidence").  As noted earlier, while the evidence may be adverse to defendants' case, this is not the measure of *unfair* prejudice.  If jurors find the evidence probative, it will directly affect their conclusion as to whether Aubrey acted with a discriminatory motive.  This is the central question in the case; it would not be improper for the jury to reach a verdict on that basis.  See *United States v. Munoz*, 36 F.3d 1229, 1233 (1st Cir. 1994) ("the question under Rule 403 is 'one of unfair prejudice – not prejudice alone,'" quoting *United States v. Moreno Morales*, 815 F.2d 725, 740 (1st Cir. 1987)).  Defendants are free to argue that singing along with songs that use the epithet or telling racially charged jokes is not indicative that Aubrey's interactions with Brown were a product of racial bias.  See *Davis*, 2000 WL 1780235 at *7 ("The Defendant claims that the jury will be prejudiced by the Defendant's admission that he has, at times, used a racial slur when becoming upset while driving.  There is no reason to believe that the jury cannot appropriately separate an angry utterance in the heat of 'road rage' from an indication of a state of mind which may have influenced the Defendant's conduct toward the Plaintiff").  Accordingly, the court denies defendants' twelfth motion *in limine*.

### O.   Defendants' Motion *in Limine* to Exclude Evidence of the Types of Alcoholic Drinks Consumed by Brown and Other Witnesses

Defendants' final motion seeks to exclude evidence or references to the types of alcoholic drinks Brown and other witnesses consumed.  Defendants assert such evidence is irrelevant.[155] Brown does not oppose the motion, and the court therefore grants it.  CA CD L.R. 7-12; *Ferrin v. Bias*, No. ED CV 02-535 RT (SGLx), 2003 WL 25588274, *1 n. 1 (C.D. Cal. Jan. 2, 2003) ("Under Local Rule 7-12, failure to file an opposition may be deemed consent to the granting of

---

[155]Drinks MIL at 3-4.

the motion").  Accordingly, the court grants the motion and excludes evidence and references to the types of alcoholic drinks Brown and other witnesses consumed.

### III.  CONCLUSION

For the reasons stated, the court:

- grants defendants' motion *in limine* No. 1.  The parties, their counsel and their witnesses may not use the word "nigger" at trial.  The parties are directed to use "racial epithet," "racial slur," or "N-word" to the extent that reference to the word is appropriate;

- grants in part and denies in part defendants' motion *in limine* No. 2.  Brown may provide brief testimony regarding his background and training as a golf instructor.  The parties are precluded from introducing evidence of Brown's popularity as a golf instructor except to the extent that such evidence is offered to prove Brown's damages;

- grants defendants' motion *in limine* No. 3 to exclude any evidence, argument, or reference to the incident between Brown and Tim Cotti at Woodley Lakes and David Aubrey's subsequent investigation;

- grants defendants' motion *in limine* No. 4 to exclude any evidence, argument, or reference to the February 2014 incident between Brown and John Ricks;

- grants defendants' motion *in limine* No. 5 to exclude any evidence, argument, or reference to the reasons for Aubrey's transfer from Woodley Lakes to a different golf course.  Plaintiff may question Siebrandt regarding her ability to discipline subordinates for failure to follow City policies, including through transfer, but may not mention Aubrey's name in any such questions or any argument concerning the scope of Siebrandt's authority;

- grants in part and denies in part defendants' motion *in limine* No. 6.  Defendants' motion is granted to the extent that it seeks to exclude evidence and argument concerning the allegation that defendants intentionally misplaced Brown's Live Scan

documentation.   The motion is denied to the extent Brown seeks to introduce evidence that Aubrey accused Brown of lying about having submitted his Live Scan documentation and Aubrey's reaction when told that Brown's documentation had been misplaced.   It is also denied to the extent it seeks to exclude evidence that Aubrey asserted that Brown was suspended for failing to file complete his Live Scan application.

- grants defendants' motion *in limine* No. 7 to exclude any evidence, argument, or reference to the incident between Aubrey and Bob Davis;

- denies defendants' motion *in limine* No. 8 to exclude any evidence, argument, or reference to Penny Siebrandt's email discussing the possibility of hiring an Asian golf instructor at Rancho Park Golf Course;

- defers decision on defendants' motion *in limine* No. 9 to exclude any evidence, argument, or reference to Aubrey's personnel issues;

- grants in part and denies in part defendants' motion *in limine* No. 10.  The court grants defendants' motion to the extent it seeks to exclude evidence, argument, or reference to (1) Brown not being permitted to inspect the golf course; (2) Brown's Live Scan application being deliberately misfiled; (3) defendants condoning Tim Cotti's use of a racial epithet; and (4) Aubrey falsifying his investigation of the incident between Brown and Cotti.  The court denies defendants' motion to the extent that it seeks to preclude unidentified immaterial evidence raised by Brown in his opposition to defendants' motion for summary judgment, e.g., evidence contained in Brown's statement of genuine issues that was not addressed in the court's summary judgment order;

- denies defendants' motion *in limine* No. 11 to exclude any argument or reference to a "secret deal" between Ward and Bobby Hinds and Brady Riggs;

42

- denies defendants' motion *in limine* No. 12 to exclude any evidence, argument, or reference to the types of music to which Aubrey listens and the kinds of jokes he tells; and

- grants defendants' motion *in limine* No. 13 to exclude any evidence, argument, or reference to the types of alcoholic drinks Brown and various witnesses consume.

As respects defendants' motion *in limine* No. 9, the court directs Brown to make an offer of proof no later than **November 3, 2014**, concerning the evidence of Aubrey's personnel issues he seeks to introduce. The offer of proof should include a statement as to why Brown believes the evidence is relevant. Defendants may file a response no later than **November 7, 2014**, addressing why the specific evidence Brown seeks to admit is inadmissible.

DATED: October 27, 2014

_____
MARGARET M. MORROW
UNITED STATES DISTRICT JUDGE